1   LATHAM & WATKINS LLP
2       Andrew M. Gass (SBN 259694)
        *andrew.gass@lw.com*
3       James K. Lynch (SBN 178600)
        *jim.lynch@lw.com*
4       Brittany N. Lovejoy (SBN 286813)
        *brittany.lovejoy@lw.com*
5   505 Montgomery Street, Suite 2000
6   San Francisco, California 94111-6538
    Telephone: +1.415.391.0600
7   Facsimile: +1.415.395.8095

8
9   Attorneys for Defendant
    iHEARTMEDIA, INC.

10
11              UNITED STATES DISTRICT COURT
12            CENTRAL DISTRICT OF CALIFORNIA

13
14  ARTHUR SHERIDAN, AN                    Case No. 2:15-CV-4067- PSG (GJSx)
    INDIVIDUAL, AND BARBARA
15  SHERIDAN, AN INDIVIDUAL,
    INDIVIDUALLY AND ON BEHALF            **MEMORANDUM OF POINTS AND**
16  OF ALL THOSE SIMILARLY               **AUTHORITIES IN SUPPORT OF**
    SITUATED,                            **MOTION TO DISMISS OR IN THE**
17                                       **ALTERNATIVE SPECIAL MOTION**
                                         **TO STRIKE UNDER CALIFORNIA**
18              Plaintiffs,              **CODE OF CIVIL PROCEDURE**
                                         **§ 425.16**
19
        v.
20
    iHEARTMEDIA, INC., a Delaware         Complaint filed:   May 29, 2015
21  corporation,                          Date:              October 5, 2015
                                          Time:              1:30 PM
22              Defendant.                Place:             Courtroom 880 – Roybal
                                          Before:            Hon. Philip S. Gutierrez
23
24
25
26
27
28

1

# **TABLE OF CONTENTS**

2

Page

3

Introduction.................................................................................................. 1

4

Background.................................................................................................. 4

5

    A.    Facts Alleged................................................................... 4

6

    B.    The Anti-SLAPP Statute ................................................ 5

7

    C.    State And Federal Copyright Principles ........................ 8

8

        1.    Federal Copyright Protection For Songs And Recordings ............................................................ 8

9

10

        2.    State Copyright Protection For Unpublished Works .................................................................. 10

11

Argument .................................................................................................. 16

12

I.    Plaintiffs' Claims Arise From Pandora's Protected Activity Under The Anti-SLAPP Statute ................................................... 16

13

14

II.    The Complaint Fails To State Claims On Which Relief Can Be Granted, And Plaintiffs Thus Cannot Show A Probability Of Prevailing........................................................................................ 19

15

16

    A.    Plaintiffs' Section 980(a)(2) Claim Fails As A Matter of Law.............................................................................. 19

17

        1.    "Exclusive Ownership" Does Not Confer All Known IP Rights............................................... 19

18

19

        2.    "Exclusive Ownership" Codifies Rights In Sound Recordings Existing As Of 1982 ....................... 22

20

    B.    Plaintiffs' Ancillary Claims Fail As A Matter of Law ...... 25

21

Conclusion ................................................................................................ 25

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page(s)

## CASES

*A&M Records, Inc., v. Heilman,*
   75 Cal. App. 3d 554 (1977) ........................................................................... 13, 25

*All One God Faith Inc. v. Hain Celestial Group, Inc.,*
   2009 WL 4907433 (N.D. Cal. Dec. 14, 2009) ................................................ 16

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ........................................................................................ 16

*Bonneville v. Peters,*
   347 F.3d 485 (3d Cir. 2003) ........................................................................... 9

*Briggs v. Eden Council for Hope & Opportunity,*
   19 Cal.4th 1106 (1999) ................................................................................... 7

*Capitol Records, Inc. v. Erickson,*
   2 Cal. App. 3d 526 (1969) ........................................................................ 13, 24, 25

*Capitol Records, LLC v. Sirius XM Radio, Inc.,*
   No. BC 520981 (Cal. Super. Ct. Oct. 14, 2014) ............................................ 4

*Cinevision Corp. v. City of Burbank,*
   745 F.2d 560 (9th Cir. 1984) .......................................................................... 17

*City of Colton v. Singletary,*
   206 Cal. App. 4th 751 (2012) ......................................................................... 6

*Cusano v. Klein,*
   473 Fed. Appx. 803 (9th Cir. 2012) ............................................................... 17

*Equilon Enter., LLC v. Consumer Cause, Inc.,*
   29 Cal.4th 53 (2002) ................................................................................. 5, 6, 7

*Flo & Eddie, Inc. v. Pandora Media, Inc.,*
   14-7648 (C.D. Cal. Feb. 23, 2015), *appeal docketed*, No. 15-55287
   (9th Cir. Feb. 24, 2015) .............................................................................. *passim*

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.,*
   13-05784 (S.D.N.Y., Dec. 12, 2014) .............................................................. 11

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.,*
   2014 WL 4725382 (C.D. Cal. Sept. 22, 2014) ........................................... *passim*

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.,*
   2015 WL 3852692 (S.D. Fla. June 22, 2015) ................................................. 4

*Flo & Eddie, Inc. v. Sirius XM Radio Inc.,*
   2015 WL 585641 (S.D.N.Y. Feb. 10, 2015) ................................................... 4

*Golan v. Holder,*
  132 S.Ct. 873 (2012) ............................................................... 19, 20, 22

*Hecimovich v. Encinal Sch. Parent Teacher Org.,*
  203 Cal. App. 4th 450 (2012) ................................................................ 17

*Klekas v. Emi Films, Inc.,*
  150 Cal. App. 3d 1102 (1984) ............................................................... 15

*Lone Ranger Television, Inc. v. Program Radio Corp.,*
  740 F.2d 718 (9th Cir. 1984) ........................................................*passim*

*Makaeff v. Trump Univ., LLC,*
  715 F.3d 254 (9th Cir. 2013) ............................................................. 6, 7

*Newsham v. Lockheed Missiles & Space Co.,*
  190 F.3d 963 (9th Cir. 1999) ................................................................. 6

*No Doubt v. Activision Publ'g, Inc.,*
  192 Cal. App. 4th 1018 (2011) ............................................................. 18

*Nygard, Inc. v. Uusi-Kerttula,*
  159 Cal. App. 4th 1027 (2008) ...................................................7, 17, 18

*People v. Sisuphan,*
  181 Cal. App. 4th 800 (2010) ............................................................... 21

*RCA Mfg. Co. v. Whiteman,*
  114 F.2d 86 (2d Cir. 1940) ............................................................. 11, 12

*Schad v. Borough of Mt. Ephraim,*
  452 U.S. 61 (1981) ............................................................................... 17

*Schwartz v. At the Cove Mgmt. Corp.,*
  2013 WL 1103479 (S.D. Cal. Mar. 14, 2013) ........................................ 4

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
  464 U.S. 417 (1984) ............................................................................. 19

*Stewart v. Rolling Stone LLC,*
  181 Cal. App. 4th 664 (2010) ............................................................... 17

*Varian Med. Sys., Inc. v. Delfino,*
  35 Cal.4th 180 (2005) ............................................................................ 6

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ............................................................................. 17

*Zacchini v. Scripps-Howard Broad. Co.,*
  433 U.S. 562 (1977) ............................................................................. 17

**STATUTES**

17 U.S.C. § 10 (1947) ............................................................................ 10

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

MPA ISO MOTION TO DISMISS OR STRIKE
CASE NO. 2:15-CV-4067-PSG (GJSx)

17 U.S.C. § 101................................................................................................8

17 U.S.C. § 102..............................................................................................14

17 U.S.C. § 106....................................................................................8, 9, 20

17 U.S.C. § 107........................................................................................2, 20

17 U.S.C. § 109........................................................................................2, 20

17 U.S.C. § 114................................................................................................9

17 U.S.C. § 301....................................................................................8, 9, 14

17 U.S.C. § 302................................................................................................8

1949 Cal. Stat., c. 921, § 4...........................................................................14

61 Stat. 656, c. 391 (July 30, 1947)..............................................................10

Act of Feb. 3, 1831, c. 16, § 1, 4 Stat. 436....................................................8

Act of July 9, 1947, c. 1107, 1947 Cal. Stat. 2546......................................12

Act to Amend and Consolidate the Acts Respecting Copyright,
   35 Stat. 1077, § 9 (March 4, 1909)..........................................................10

Cal. Bus. & Prof. Code § 17200.....................................................................5

Cal. Civ. Code § 980 (amended 1947, 1949, 1982) ..........................*passim*

Cal. Civ. Code § 983 (amended 1947, 1949, 1982) ...................11, 12, 15

Cal. Civ. Code § 986.....................................................................................21

Cal. Civ. Proc. Code § 425.16 .......................................................*passim*

Cal. Civ. Proc. Code § 425.17 ...............................................................7, 18

Copyright Act of 1790, 1 Stat. 124, § 2.......................................................10

Digital Performance Right in Sound Recordings Act of 1995,
   Pub. L. No. 104-39, 109 Stat. 336..............................................................9

Sound Recording Act of 1971,
   Pub. L. No. 92-140, 85 Stat. 391................................................................9

**RULES**

Fed. R. Civ. P. 12(b)(6) ...............................................................................4

Fed. R. Civ. P. 56.........................................................................................4

1

# OTHER AUTHORITIES

2

Leg. Assemb. B. 3483,
   1981-82 Reg. Sess. (Cal. 1982) .......................................................14, 15, 22, 23

3

Leg. Assemb. B. 566,
   57th Gen. Sess. (Cal. 1947) ......................................................................... 12, 13

4

Paul Goldstein, *Federal System Ordering of the Copyright Interest*, 69
   Colum. L. Rev. 49 (1969)............................................................................... 24

5

6

*Performance Royalty*, Hearings before the S. Subcomm. on Patents,
   Trademarks and Copyrights of the S. Comm. on the Judiciary, 94th
   Cong. (1975) ................................................................................................... 15

7

8

Robert L. Bard *et. al*, *A Public Performance Right in Recordings:
   How to Alter the Copyright System Without Improving It*, 43 Geo.
   Wash. L. Rev. 152 (1974) ............................................................................... 9

9

10

U.S. Copyright Office, *Performance Right in Sound Recordings*
   (1978)............................................................................................................. 12

11

U.S. Copyright Office, *Study No. 29: Protection of Unpublished
   Works* (1961) .......................................................................................... 10, 11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Defendant iHeartMedia, Inc. ("iHeartMedia") provides popular internet radio services under the "iHeartRadio" brand, and has been sued for broadcasting music to the public.  That is constitutionally protected conduct.  iHeartMedia hereby files a motion to dismiss the Complaint or, in the alternative, to strike each cause of action under California's "anti-SLAPP" statute.

This is a copycat lawsuit, modeled after litigation filed by Flo & Eddie, Inc., against Sirius and Pandora.[1]  Like Flo & Eddie, Plaintiffs here purport to own California state law rights in "pre-1972" sound recordings, and have filed a complaint against a radio broadcaster for playing those recordings without a license.  Like the *Sirius* and *Pandora* cases, this one is a putative class action, asserting four causes of action: violation of California Civil Code section 980(a)(2); conversion; misappropriation; and unfair competition.

The present motions raise substantially the same legal issues as the anti-SLAPP motion Pandora filed against Flo & Eddie.  On Pandora's motion, this Court ruled (1) that the complaint arose from "protected activity" under California's anti-SLAPP law, but (2) that Flo & Eddie could show a "probability of prevailing" on their claims.  *See Pandora* at 6, 14.  iHeartMedia respectfully asks the Court to revisit the latter holding here, pending the Ninth Circuit's review in the *Pandora* case.

In the Court's prior decisions on the merits, it concluded that the statutory phrase "exclusive ownership" in Civil Code section 980(a)(2) confers "all rights that can attach to intellectual property," save the singular enumerated exception for "cover" recordings.  *See Sirius*, 2014 WL 4725382 at *5.  That interpretation, however, conflicts with practice, precedent, and legislative history alike.  It is

---

[1] *See Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 13-05693, 2014 WL 4725382 (C.D. Cal. Sept. 22, 2014) ("*Sirius*"); *Flo & Eddie, Inc. v. Pandora Media, Inc.*, 14-7648 (C.D. Cal. Feb. 23, 2015) (Dkt. No. 28) ("*Pandora*"), *appeal docketed*, No. 15-55287 (9th Cir. Feb. 24, 2015).

wrong *inter alia* because:

- The fair use doctrine is constitutionally required—yet section 980(a)(2) nowhere codifies fair use, unlike the federal copyright statute. *Cf.* 17 U.S.C. § 107.  Under the Court's reading of section 980(a)(2), the statute is thus unconstitutional.

- Unlike the federal copyright statute, section 980(a)(2) does not codify a "first sale" limitation—*i.e.*, a rule providing that no accounting to the rightsholder is required for distributions of a particular copy of a work following its first sale to the public. *Cf.* 17 U.S.C. § 109.  Yet without such a limitation, every used record store in the state of California would be, and would have been for decades, a serial state-law copyright infringer.

- The Ninth Circuit has ruled that prior to the 1982 statutory revision yielding the current version of section 980(a)(2), the distribution of a sound recording to the public terminated all state law copyright protection for the work.  *See Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F.2d 718, 726 (9th Cir. 1984).  If the 1982 revision afforded "all rights that can attach to intellectual property" to those previously "published" sound recordings, it would have been the single largest rescission of works from the public domain in U.S. history—yet the revision met with no objection whatsoever from the broadcasting industry or anyone else, at a time when *any* rescission of works from the public domain was widely understood to be unconstitutional.

Each of these implausible or impossible implications is unavoidable under the Court's prevailing interpretation of section 980(a)(2).  A different interpretation is thus warranted.

Properly understood, the term "exclusive ownership" in section 980(a)(2)

1   refers to the rights in sound recordings under state copyright law that the California

2   Legislature had established, and the courts had enforced, as of the 1982 statutory

3   revision.  "[E]xclusive ownership" is exactly the same phrase that appeared in the

4   previous version of the statute.  The legislative history makes unmistakably clear

5   that the 1982 update was intended to be nothing more than a technical amendment

6   to conform California state law to the newly revised federal Copyright Act, without

7   any substantive change.  *Before* the 1982 revision, California copyright protection

8   under section 980 applied only to previously unpublished sound recordings; and

9   *after* the 1982 revision, California copyright protection under section 980 applied

10  only to previously unpublished sound recordings.

11       The sound recordings at issue in this case were all "published" during the era

12  when publication terminated state law copyright protection.  Nothing in the time

13  since has resurrected that state law copyright protection.  As a result, the

14  "exclusive ownership" codified in section 980(a)(2) does not prohibit

15  iHeartMedia's radio broadcast of Plaintiffs' previously published pre-1972 sound

16  recordings—conduct materially indistinguishable from what radio stations have

17  been doing in California for nearly 100 years.  The section 980(a)(2) cause of

18  action in the Complaint thus fails as a matter of law.

19       The ancillary claims for conversion, misappropriation, and unfair

20  competition fare no better.  iHeartMedia hereby challenges them *both* to the extent

21  that they depend on the section 980(a)(2) cause of action, *and* to the extent that

22  Plaintiffs assert them as independent, freestanding claims.  That is, they fail

23  because the section 980(a)(2) claim should fail.  *Cf. Sirius*, 2014 WL 4725382, at

24  *10-11.  And they also fail because, irrespective of the section 980(a)(2) claim,

25  conversion, misappropriation, and unfair competition are not legal theories that

26  proscribe the conduct alleged to be unlawful in the Complaint: a radio station's

27  playing recorded music to its listeners, and carrying out the technological steps

28  necessary to do so.

1    iHeartMedia thus moves to dismiss the Complaint under Federal Rule of

2  Civil Procedure 12(b)(6), on the ground that each cause of action fails to state a

3  claim on which relief can be granted.  And, in the alternative, iHeartMedia moves

4  to strike each cause of action under California's anti-SLAPP law.[2]  The allegations

5  here arise from "protected activity," just as they did against Pandora; and Plaintiffs

6  cannot show a "probability of prevailing," because the Complaint should fail as a

7  matter of law.  *See* Cal. Code Civ. Proc. § 425.16(b)(1).[3]

8        As other courts have held, the issue of state law protection for pre-1972

9  sound recordings is "in fact a difficult legal question about which reasonable minds

10  can differ."  *Flo & Eddie, Inc. v. Sirius XM Radio Inc.*, 2015 WL 585641, at *2

11  (S.D.N.Y. Feb. 10, 2015) (granting motion for certification of interlocutory

12  appeal).  One federal court recently ruled that under Florida law, the rights asserted

13  in this action do not exist.  *See Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 2015

14  WL 3852692, at *5 (S.D. Fla. June 22, 2015).  A state court in California issued a

15  tentative order to the same effect, only to reverse course later.  *See Capitol*

16  *Records, LLC v. Sirius XM Radio, Inc.*, No. BC 520981, at 4 (Cal. Super. Ct. Oct.

17  14, 2014).  Under these unusual circumstances, Defendant respectfully asks the

18  Court to revisit its merits rulings in *Sirius* and *Pandora* and reverse course.

19                          **BACKGROUND**

20    **A.    Facts Alleged**

21        iHeartMedia operates an internet radio service, iHeartRadio.  The service

22  "streams music and other programming to its paid subscribers via the internet,"

---

24  [2] Pursuant to Local Rule 7-3, counsel for both parties met and conferred regarding these Motions telephonically on July 7, 2015.

25  [3] Federal courts recognize a distinction between anti-SLAPP motions in the nature
26  of a Fed. R. Civ. P. 12(b)(6) motion, which assert defenses as a matter of law, and anti-SLAPP motions in the nature of a summary judgment motion under Fed. R.
27  Civ. P. 56.  *See, e.g., Schwartz v. At the Cove Mgmt. Corp.*, 2013 WL 1103479, at *1-2 (S.D. Cal. Mar. 14, 2013).  Discovery is allowed to contest the latter but not the former.  *Id.*  The anti-SLAPP motion at issue here is in the nature of a 12(b)(6)
28  motion, in that takes all facts alleged in the Complaint as true, and mounts only legal (not factual) defenses.

1  which users can access "on computers, car radios, smart phones and other internet-

2  connected devices."  Compl. ¶ 2.  iHeartRadio also broadcasts over the Internet

3  "hundreds of traditional (terrestrial AM and FM) radio stations" owned by

4  iHeartMedia.  *Id.* ¶ 3.  Although iHeartMedia obtains copyright licenses to deliver

5  music to its users when required by law—including licenses for the "musical

6  works" (*i.e.* songs) embodied in all recordings—iHeartMedia allegedly does not

7  take an additional license specifically for the sound recordings, themselves, when

8  the recordings were made before 1972.  *See id.* ¶ 4.

9       Plaintiffs Arthur and Barbara Sheridan allegedly own state law copyrights in

10  a number of pre-1972 sound recordings, many of which are popular titles in the

11  Rhythm & Blues genre of music.  *See id.* ¶¶ 12, 13.  They have filed a putative

12  class action against iHeartMedia on behalf of "[a]ll owners of sound recordings of

13  musical performances that were fixed/recorded prior to February 15, 1972 and

14  were performed, streamed, distributed, reproduced or otherwise exploited by

15  iHeartMedia Inc."  *Id.* ¶ 18.

16       Plaintiffs claim that iHeartMedia has "repeatedly infringed/violated" their

17  "ownership interests in their pre-1972 recordings, including the right to publicly

18  perform them" by "streaming these performances to California listeners."  *Id.*

19  ¶¶ 25-26.  They allege that iHeartMedia's conduct gives rise to four discrete causes

20  of action: violations of California Civil Code section 980(a)(2) (*id.*);

21  misappropriation (*id.* ¶ 29); conversion (*id.* ¶ 30); and unfair competition under

22  California Business and Professions Code section 17200 (*id.* ¶ 31).  Plaintiffs seek

23  at least $5 million in damages on behalf of the class (*id.* ¶ 9), along with various

24  forms of equitable relief (*id.* "Prayer for Relief").

25  **B.    The Anti-SLAPP Statute**

26       California enacted an "anti-SLAPP" statute in 1992.  *Equilon Enter., LLC v.*

27

28

1  *Consumer Cause, Inc.*, 29 Cal.4th 53, 59-60 (2002).[4]  Its purpose is to protect the

2  exercise of First Amendment rights against the burdens imposed by legal claims

3  that are not reasonably likely to prevail.  *Varian Med. Sys.*, *Inc. v. Delfino*, 35

4  Cal.4th 180, 192 (2005).  Under established Ninth Circuit precedent, defendants

5  are permitted to file anti-SLAPP motions in federal court cases governed by

6  California law.  *Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 973

7  (9th Cir. 1999); *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013).

8         The anti-SLAPP statute creates a "special motion to strike" applicable to

9  causes of action that would impose liability based on the exercise of the

10  constitutional right to Free Speech.  California Code of Civil Procedure section

11  425.16(b)(1) provides:

12              A cause of action against a person arising from any act of that

13              person in furtherance of the person's right of petition or free

14              speech under the United States Constitution or the California

15              Constitution in connection with a public issue shall be subject

16              to a special motion to strike, unless the court determines that

17              the plaintiff has established that there is a probability that the

18              plaintiff will prevail on the claim.

19  Defendants may file anti-SLAPP motions as a matter of right within 60 days of the

20  service of a complaint.  Cal. Civ. Proc. Code § 425.16(f).

21         Resolution of an anti-SLAPP motion proceeds in two steps.  First, "the

22  moving defendant must make a prima facie showing that the plaintiff's suit arises

23  from an act in furtherance of the defendant's constitutional right to free speech."

24  *Makaeff*, 715 F.3d at 261.  Courts sometimes frame this question as whether the

25  defendant can show that the plaintiff's claim would burden "protected activity."

26  *See, e.g.*, *City of Colton v. Singletary*, 206 Cal. App. 4th 751, 766 (2012).  Second,

27

28  ────────────
[4] "SLAPP" is an acronym for "strategic lawsuit against public participation."
   *Equilon*, 29 Cal.4th at 57.

1   "[t]he burden then shifts to the plaintiff . . . to establish a reasonable probability

2   that it will prevail on its claim," despite the claim's effect on "protected activity."

3   *Makaeff*, 715 F.3d at 261-62.  If the defendant shows that the plaintiff's claims

4   target "protected activity," and the plaintiff fails to carry its burden to show a

5   probability of prevailing, the court strikes the plaintiff's offending claims.  *See id.*

6     The anti-SLAPP statute defines "protected activity" very broadly.  It covers

7   not just First Amendment conduct addressed to *political* issues, but any conduct in

8   furtherance of the defendant's right to Free Speech on "*any issue in which the*

9   *public is interested*."  *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1042

10  (2008) (emphasis added).  Thus when California adopted a number of exemptions

11  from the anti-SLAPP law's coverage—including a limited category of "action[s]

12  brought solely in the public interest"—the Legislature expressly *carved out of*

13  *those exemptions* suits asserting liability from the dissemination of artistic works.

14  Specifically, Code of Civil Procedure section 425.17(d)(2) provides that there is *no*

15  exemption from the anti-SLAPP statute for "[a]ny action against any person or

16  entity based upon the creation, dissemination, exhibition, advertisement, or other

17  similar promotion of any dramatic, literary, musical, political, or artistic work."

18    Both the Legislature and the California Supreme Court have emphasized that

19  the anti-SLAPP law must be read generously in favor of the constitutional rights it

20  protects.  In response to several unduly narrow judicial interpretations of the

21  statute, the Legislature amended its preamble in 1997 to add a directive that section

22  425.16 "be construed *broadly*."  *See Briggs v. Eden Council for Hope &*

23  *Opportunity*, 19 Cal.4th 1106, 1119 (1999) (emphasis added); Code Civ. Proc.

24  § 425.16(a).  The Court has honored that instruction, consistently rejecting efforts

25  by litigants and lower courts to pinch the anti-SLAPP statute's scope.  *See, e.g.*,

26  *Equilon*, 29 Cal.4th at 57 (defendant need not show that plaintiff's action "was

27  brought with the *intent* to chill the defendant's exercise of constitutional speech or

28  petition rights") (emphasis added); *Briggs*, 19 Cal.4th at 1119 (holding that courts

1  "whenever possible, should interpret the First Amendment and section 425.16 in a

2  manner favorable to the exercise of freedom of speech, not its curtailment")

3  (quotation marks omitted).

### C.   State And Federal Copyright Principles

5       This case, like the preceding litigation before the Court concerning the same

6  issues, involves the interrelationship between state and federal copyright laws.  By

7  and large, copyright protection in the United States is the province of the federal

8  government.  *See* 17 U.S.C. § 301(a).  But Congress has carved out limited

9  categories in which states can choose whether (and to what extent) to protect

10  particular types of works.  "Sound recordings" made before February 15, 1972 are

11  one such category.  17 U.S.C. § 301(c).

### 1.   Federal Copyright Protection For Songs And Recordings

13       Federal copyright law has always treated *songs* differently from *recordings*

14  of songs.  Songs (also known as "musical works") are the notes and lyrics written

15  by the composer and author.  Since 1831, songs have enjoyed federal copyright

16  protection.  *See* Act of Feb. 3, 1831, c. 16, § 1, 4 Stat. 436.  Regardless of the

17  outcome of this case, it is definitely, beyond dispute, a copyright infringement—

18  under federal law—for someone to take a hit *song* by any of the artists at issue and

19  reproduce, distribute, or publicly perform it without a license.[5]  *See* 17 U.S.C.

20  § 106.  "Performing rights societies" like ASCAP, BMI, and SESAC exist for the

21  purpose of collecting license fees from companies like iHeartMedia to pay to the

22  rightsholders of these works every time a song gets publicly performed.  *See* 17

23  U.S.C. § 101 (defining "performing rights society").  Those federal "musical

24  work" copyrights apply to songs recorded before 1972 no less than songs recorded

25  today, and last as long as the life of the author plus seventy years.  *See* 17 U.S.C.

26  § 302.  Plaintiffs do not allege that iHeartMedia has failed to pay any required

27  "musical work" royalties.

28

---

[5] Assuming, of course, that those works remain under federal copyright protection.

1        Historically, there was *no* federal copyright protection for the *sound*
2   *recording* that captured a particular rendition of a musical work.  In response to
3   concerted lobbying by the record industry, Congress changed that policy in the
4   Sound Recording Act of 1971.  *See* Sound Recording Act of 1971, Pub. L. No. 92-
5   140, 85 Stat. 391 ("1971 Act"); Robert L. Bard *et. al*, *A Public Performance Right*
6   *in Recordings: How to Alter the Copyright System Without Improving It*, 43 Geo.
7   Wash. L. Rev. 152, 153-54 (1974).  Congress chose, however, to impose
8   significant limitations on the new sound recording copyright it created.  First, a
9   sound recording copyright, unlike a musical work copyright, did not grant the
10  owner any exclusive right of "public performance"—so playing a sound recording
11  over the radio triggered no obligation to pay a royalty (beyond the one already
12  owed to the musical work copyright holder).[6]  *Bonneville v. Peters*, 347 F.3d 485,
13  487 (3d Cir. 2003).  Second, even the limited rights that were available would
14  apply only to sound recordings "fixed," *i.e.*, made, after February 15, 1972.  17
15  U.S.C. § 301(c).

16       In 1995, Congress took a step to broaden the legal protection for those sound
17  recordings, granting them a form of "public performance" right for the first time.
18  *See* Digital Performance Right in Sound Recordings Act of 1995, Pub. L. No. 104-
19  39, 109 Stat. 336.  But even so, it restricted the right to cover only public
20  performances delivered via *digital transmission*.  *See* 17 U.S.C. § 106(6).  That
21  law, as amended, remains in effect today.  So for sound recordings protected by
22  federal copyrights, there is no royalty obligation for over-the-air radio plays or in-
23  person public performances, but there is a royalty obligation for public
24  performances carried out over a digital medium (subject to the elaborate
25  compulsory licensing regimes codified in 17 U.S.C. section 114).

26  
27  [6] Notably, there was no outcry at the time by record labels or anyone else
    complaining that Congress had *diminished* the protection then accorded sound
    recordings under state law—even though going forward, sound recordings would
28  be governed exclusively by federal law and would enjoy *no* public performance
    right.

## 2.     State Copyright Protection For Unpublished Works

From the time of the first U.S. copyright law, adopted by the first U.S. Congress in 1790, federal statutory copyright protection was historically available only for *published* works.  *See* Copyright Act of 1790, 1 Stat. 124, § 2 (conditioning copyright on the "publishing" of a map, chart or book).[7]  This was the rule for most of the 20th century, including the period during which the titles at issue here were recorded.  *See* Act to Amend and Consolidate the Acts Respecting Copyright, 35 Stat. 1077, § 9 (March 4, 1909) ("1909 Act") ("[A]ny person entitled thereto by this Act may secure copyright for his work by publication thereof with the notice of copyright required by this Act[.]"); 61 Stat. 656, c. 391 (July 30, 1947) (recodifying the publication requirement in 17 U.S.C. § 10).[8]

That left a void, of course, for *unpublished* works: what rights would an author have if someone purloined her manuscript from her nightstand drawer and started selling it?  The answer developed through a combination of judicial decisions recognizing a "common law" copyright in unpublished works, and state statutes codifying those rights.  *See generally 1961 Report*.

California was one of the states to address the issue by statute.  In 1872, the Legislature adopted Civil Code section 980, which provided:

> The author of any product of the mind, whether it is an invention, or a composition in letters or art . . . has an exclusive ownership therein, and in the representation or expression thereof.

Cal. Civ. Code § 980 (1874) (amended 1947, 1949, 1982).  The same law, however, limited that protection to the period *before* a work was "public"; Civil

---

[7] In fact, this tradition dated all the way back to the world's first modern copyright law, England's Statute of Anne, enacted in 1710.  *See* U.S. Copyright Office, *Study No. 29: Protection of Unpublished Works*, at 2 (1961) ("*1961 Report*") ("[T]he Statute of Anne dealt only with copyright in books after publication[.]").

[8] It was not until the 1976 Copyright Act that Congress extended federal protection to unpublished works.

Code section 983 read:

> If the owner of a product of the mind intentionally makes it
> public, a copy or reproduction may be made public by any
> person, without responsibility to the owner, so far as the law of
> this State is concerned.

Cal. Civ. Code § 983 (1874) (amended 1947, 1949, 1982).  This restriction
mirrored the judicial treatment of "common law" copyrights, which universally
held that the "publication" of a work divested its common law protection.  *See*
*1961 Report* at 1 ("It is the accepted rule of law that the property right which the
author has under the common law is terminated by publication of the work.").

When sound recordings started gaining commercial traction in the early 20th
century, they were not subject to federal copyright protection, as discussed above.
It thus became an important question to litigants precisely what it meant for a
record to be "ma[de] public" (under the 1872 California statute) or "published"
(under the common law).  That event, whenever it occurred, would extinguish
common law (or California statutory) copyright protection—and no federal
copyright protection would take its place.

For many years, the leading judicial opinion on the issue of when
publication divested a sound recording of its common law copyright was *RCA
Manufacturing Co. v. Whiteman*, 114 F.2d 86 (2d Cir. 1940), written by Judge
Learned Hand.[9]  In that case, RCA filed suit to enjoin "the broadcasting of
phonograph records of musical performances" over the radio by the W.B.O.
Broadcasting Corporation.  *Id*. at 87.  Seeking specifically to ensure license
payments for radio plays, RCA had put a legend on its records saying that they
were "Only For Non-Commercial Use on Phonographs in Homes."  *Id*.  That

---

[9] In the 1950s, New York state courts considered the same legal issues at stake in
*Whiteman* and reached contrary decisions.  *See* Order Denying Defendant's Motion
for Reconsideration at 7, *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 13-05784
(S.D.N.Y., Dec. 12, 2014).

tactic, the Second Circuit ruled, did not work: "the 'common-law' property in these performances ended with the sale of the records and that . . . restriction did not save it." *Id.* at 89. Selling the phonographs in commerce was a "'publication' in the sense that that destroys the 'common-law property'" interest at stake. *Id.* at 88-89. This was so, Judge Hand wrote, regardless of the fact that sound recordings could not be protected under the 1909 Act (the federal copyright law then in effect); "the fact that they are not within the act should make no difference," he explained. *Id.* at 89. "[W]e see no reason why the same acts that unconditionally dedicate the common-law copyright in works copyrightable under the act, should not do the same in the case of works not copyrightable." *Id.*

This was the widely recognized state of the common law less than seven years later, in mid-1947, when California first revised Civil Code section 983.[10] The new version of that provision, which remained in effect throughout the period when most of the recordings at issue in this case were made, said:

> If the owner of a composition in letters or art *publishes it* the same may be used in any manner by any person, without responsibility to the owner insofar as the law of this State is concerned.

*See* Act of July 9, 1947, c. 1107, 1947 Cal. Stat. 2546; Cal. Civ. Code § 983 (West 1947) (emphasis added). The legislative history of the 1947 revision makes clear that its purpose was to "bring the California statute into accord with federal law and judicial precedent within and without California." *See* Leg. Assemb. B. 566, 57th Gen. Sess. (Cal. 1947) ("1947 Leg. Hist.") (attached hereto as App. Ex. 9), at 25. That is why the Legislature substituted the phrase "publishes it"—tracking the

---

[10] The *Whiteman* decision—which "opened the door for the unrestricted, unauthorized, and uncompensated use of phonograph records on radio stations"— is in fact widely understood to have been a leading cause of the famous American Federation of Musicians strike against recording new phonographs, which lasted 27 months from 1942 to 1944. *See* U.S. Copyright Office, *Performance Right in Sound Recordings*, at 654 (1978) (describing the strike as the union's "solution" to *Whiteman* under the leadership of James Petrillo).

common law concept of "publication"—for the slightly distinct phrase "makes it public" in the old version of the law. The impetus for the edit was simply to avoid potential confusion, rather than effectuate a substantive change in prevailing doctrine; as the legislation's sponsor explained, "[o]ur courts have [in practice] construed the [1872 version of the] California statutes in accord with judicial precedent throughout the United States." *Id.* at 37.  To illustrate that point, he cited a 1936 Second Circuit opinion by Judge Hand as an example of a case that reflected the accepted approach to interpreting both section 983 and the common law principles it embodied. *Id.*  There is no question, then, that the amendment was intended, out of an abundance of caution, to confirm that California "copyright divestiture" doctrine was to follow the widely accepted common law of "publication," as it stood in 1947.  Any sound recording published in that era lost its California copyright protection.

That said, courts over the ensuing years would recognize that *other* common law doctrines—specifically misappropriation, conversion, and unfair competition—could effectively restrict a limited set of uses of published sound recordings.  In *Capitol Records, Inc. v. Erickson*, for example, the defendant was "admittedly in the business" of buying records on the open market, duplicating them, and reselling the pirated copies to the public in direct competition with the plaintiff. 2 Cal. App. 3d 526, 528 (1969).  The Court of Appeal affirmed a preliminary injunction halting that practice, invoking misappropriation and unfair competition doctrine as the basis for its ruling. *Id.* at 537-38.  *A&M Records, Inc., v. Heilman* presented a similar fact pattern, with the defendant in "the business of advertising and selling pirated records and tapes." 75 Cal. App. 3d 554, 560 (1977).  The Court of Appeal affirmed an award of damages for misappropriation and conversion. *Id.* at 570.  Neither case involved section 980, California's copyright statute; and neither opinion suggested, or even allowed, that misappropriation, conversion or unfair competition law replicates the full bundle of

1   rights available under copyright law.

2          Against this backdrop, the law in California remained unchanged until

3   1982,[11] when the state Legislature simultaneously amended both section 980

4   (which had granted a California copyright to "[t]he author or proprietor of any

5   composition in letters or art" in the first instance) and section 983.  The 1982

6   revision was a clean-up bill, designed to "repeal existing provisions of state

7   copyright law which have become obsolete in view of the preemption thereof by

8   the Federal Copyright Act of 1976."  *See* Leg. Assemb. B. 3483, 1981-82 Reg.

9   Sess. (Cal. 1982) ("1982 Leg. Hist.") (attached hereto as App. Ex.  11) at 45.  The

10  1976 Act had made federal law newly applicable to *any* works "fixed in a tangible

11  medium of expression," regardless of whether they were published or unpublished.

12  *See* 17 U.S.C. § 102(a).  And it contained a sweeping preemption clause, 17 U.S.C.

13  section 301, that expressly overrode the ability of states like California to provide

14  the protection they had historically accorded *unpublished* works.  The California

15  Legislature thus undertook to "repeal those statutes preempted by federal law," and

16  replace them with narrower provisions governing the modest subject matters still

17  eligible for state regulation.  1982 Leg. Hist. at 23.

18         One of those replacements was a new section 980(a), which in clause (2)

19  addressed sound recordings made before 1972.  That provision, the legislative

20  digest made clear, was intended to do nothing more than "maintain rights and

21  remedies in sound recordings fixed prior to February 15, 1972."  *See* 1982 Leg.

22  Hist. at 14.  The text provided, in full:

23              The author of an original work of authorship consisting of a

24              sound recording initially fixed prior to February 15, 1972, has

25              an exclusive ownership therein until February 15, 2047, as

26              against all persons except one who independently makes or

27

28  _____
    [11] A 1949 revision recodified the text of the 1947 version of section 983 into a new
    section 983(a).  *See* 1949 Cal. Stat., c. 921, p. 1686, § 4.

duplicates another sound recording that does not directly or indirectly recapture the actual sounds fixed in such prior sound recording, but consists entirely of an independent fixation of other sounds, even though such sounds imitate or simulate the sounds contained in the prior sound recording.

Cal. Civ. Code § 980(a)(2).

At the same time, the 1982 statutory revision deleted the 1947 version of section 983, which had always "terminat[ed] common law copyright upon publication of the work." *See* 1982 Leg. Hist. at 54. This amendment was necessary, the State Bar explained, because the new federal copyright law "abolish[ed] a former distinction between state protection for unpublished works and federal protection for published works." *Id.* at 55; *see also Klekas v. Emi Films, Inc.*, 150 Cal. App. 3d 1102, 1108-09 (1984) ("Congress, by passing the 1976 Act, intended to abolish th[e] dual system of common-law copyright for unpublished works and statutory copyright for published works[.]"). Going forward, no new *unpublished* works could be eligible for state law copyright protection at all—because federal law, to the exclusion of state law, would newly cover those works no less than published ones. So it was pointless to leave a statutory provision on the books *extinguishing* state protection upon publication.

There was "no known opposition to the bill." 1982 Leg. Hist. at 50. That resounding silence stands in stark contrast to the decades of rancorous public policy debate and legislative wrangling over whether to *establish* a performance right for sound recordings.[12] If the 1982 revision of California Civil Code section 980 resurrected protection for sound recordings whose state copyright protection

_____

[12] *See, e.g., Performance Royalty*, Hearings before the S. Subcomm. on Patents, Trademarks and Copyrights of the S. Comm. on the Judiciary, 94th Cong., at 1 (1975) (statement of Senator Scott) ("Today we are holding hearings on a matter of great importance and interest to all of us. We will consider whether artists . . . should be compensated when recordings of their work are played publicly. . . . I have supported this extension of the performance royalty concept for the past 30 years. . . . The broadcasting industry has been a major opponent.").

had previously been terminated by publication, it did so without anyone in the broadcasting industry so much as writing a letter to the editor against that fundamental transformation of the California copyright regime.

**ARGUMENT**

This Court should grant iHeartMedia's motion to dismiss because the Complaint fails to state a claim on which relief can be granted. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Taking all of the allegations as true, *id.*, iHeartMedia has not violated any California law.

In the alternative, this Court should grant iHeartMedia's anti-SLAPP motion. As in *Pandora*, the liability alleged here arises from "protected activity" under California Code of Civil Procedure section 425.16, so the first prong of the anti-SLAPP inquiry is satisfied. And under the second prong of the anti-SLAPP inquiry, Plaintiffs cannot show a probability of prevailing for the same reasons that their Complaint should be dismissed: the conduct at issue is perfectly lawful.[13]

## I.   PLAINTIFFS' CLAIMS ARISE FROM PANDORA'S PROTECTED ACTIVITY UNDER THE ANTI-SLAPP STATUTE

This Court has already ruled, in *Pandora*, that an internet radio station's "streaming [pre-1972 sound recordings] to users" constitutes "'protected activity' under the first prong of the anti-SLAPP statute." *Pandora* at 6. This holding applies to iHeartMedia no less than it did to Pandora, as the conduct alleged to give rise to liability in the two cases is effectively identical.

The same result is also independently warranted here. The anti-SLAPP statute allows defendants to strike baseless claims asserting liability arising from

---

[13] In the event this Court denies the anti-SLAPP motion, iHeartMedia respectfully seeks a stay of all proceedings pending an appeal of that order, or in the alternative the opportunity to brief the stay issue. *See All One God Faith, Inc. v. Hain Celestial Group, Inc.*, 2009 WL 4907433, at *2 n. 2 (N.D. Cal. 2009) ("The appeal of a ruling on an anti-SLAPP motion imposes an automatic stay of all further trial court proceedings on the merits."); *Pandora*, Dkt. No. 53 (Order Staying Action).

"any . . . conduct in furtherance of the exercise of the constitutional right . . . of free speech in connection with a public issue or an issue of public interest." Cal. Civ. Proc. Code § 425.16(e)(4) (defining actions covered by § 425.16(b)(1)). That category encompasses all of iHeartMedia's conduct that Plaintiffs allege is illegal.

"There is no doubt that entertainment, as well as news, enjoys First Amendment protection." *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 578 (1977). More specifically, "[m]usic, as a form of expression and communication, is protected under the First Amendment." *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989). That protection extends not just to the original creators of musical works and recordings, but also to third parties who disseminate them; thus "motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works, [all] fall within the First Amendment guarantee." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981). iHeartMedia's streaming of music to its users is, beyond dispute, an exercise of First Amendment rights. *See Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 567-68 (9th Cir. 1984) (making expressive materials available to the public "further[s] a first amendment interest").

All of the Free Speech conduct at issue in this case is also "in connection with a public issue or an issue of public interest" within the meaning of the anti-SLAPP law. "Like the SLAPP statute itself, the question whether something is an issue of public interest must be 'construed broadly.'" *Hecimovich v. Encinal Sch. Parent Teacher Org.*, 203 Cal. App. 4th 450, 464 (2012) (quoting Cal. Civ. Proc. Code § 425.16(a)). First Amendment expression is deemed to qualify whenever it "concerns a topic of widespread public interest and contributes in some manner to a public discussion of the topic." *Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664, 677 (2010); *see also Nygard*, 159 Cal. App. 4th at 1042 (explaining that "'an issue of public interest' . . . is any issue in which the public is interested," and that "the issue need not be 'significant' to be protected under the anti-SLAPP statute—

1  it is enough that it is one in which the public takes an interest"). The Ninth Circuit

2  has held that a suit asserting liability from the public dissemination of a popular

3  rock band's recorded performances satisfies this standard. *See Cusano v. Klein*,

4  473 Fed. Appx. 803, 804 (9th Cir. 2012); *see also Stewart*, 181 Cal. App. 4th at

5  678 (listing widely-recognized band names in a magazine is an exercise of Free

6  Speech rights in connection with an "issue of public interest"); *No Doubt v.*

7  *Activision Publ'g, Inc.*, 192 Cal. App. 4th 1018, 1027 (2011) (same for using band

8  members' likenesses in a video game where the band members had achieved

9  widespread fame). The present suit does the same: iHeartMedia has been accused

10  of disseminating "popular titles in the Rhythm & Blues genre," which are plainly

11  material "in which the public takes an interest." *See* Compl. ¶ 12; *Nygard*, 159

12  Cal. App. 4th at 1042. iHeartMedia's Free Speech conduct is thus "in connection

13  with . . . an issue of public interest," just as Pandora's was. *See* Cal. Civ. Proc.

14  Code § 425.16(e)(4); *Pandora* at 6.

15       iHeartMedia's streaming music to users—the activity that Plaintiffs claim

16  gives rise to liability—therefore constitutes "protected activity" under the anti-

17  SLAPP law. In fact, California Code of Civil Procedure section 425.17(d)(2)

18  expressly recognizes that anti-SLAPP motions *can* be brought to strike lawsuits *of*

19  *exactly this type,* specifically including "[a]ny action against any person or entity

20  based upon the . . . dissemination, exhibition . . . or other similar promotion of any

21  . . . musical . . . or artistic work[.]" Litigation against a radio broadcaster over its

22  performances of allegedly popular recorded songs plainly fits that category.[14]

23       Plaintiffs' claims arise from iHeartMedia's exercise of constitutional rights

24  protected by California Code of Civil Procedure section 425.16(b)(1), so

25  iHeartMedia carries its burden under the first prong of the anti-SLAPP inquiry.

26

27

28

[14] We do not suggest that Plaintiffs' suit is otherwise a qualifying "action brought solely in the public interest" under section 425.17(b). It is not.

## II.   THE COMPLAINT FAILS TO STATE CLAIMS ON WHICH RELIEF CAN BE GRANTED, AND PLAINTIFFS THUS CANNOT SHOW A PROBABILITY OF PREVAILING

On the merits, the Court should grant iHeartMedia's motion to dismiss or, in the alternative, its anti-SLAPP motion, because Plaintiffs' claims fail as a matter of law. *Cf. Pandora* at 7 ("If the Court agrees with [the moving defendant's] theory, it will grant the anti-SLAPP motion because [the plaintiffs] have no probability of prevailing in a lawsuit premised on the violation of non-existent rights."). iHeartMedia recognizes that this Court has previously ruled that broadcasting pre-1972 sound recordings does violate state law rights, but respectfully asks the Court to revisit those holdings, pending the Ninth Circuit's review in the *Pandora* case. *See Pandora*, Dkt. No. 30 (Notice of Appeal).

### A.   Plaintiffs' Section 980(a)(2) Claim Fails As A Matter of Law

The Court's interpretation of the statutory phrase "exclusive ownership" in *Sirius* and *Pandora* is wrong as a matter of law. *See* Cal. Civ. Code § 980(a)(2). That language does not confer "all rights that can attach to intellectual property," with just one single exception for "cover" recordings enumerated elsewhere in the provision. *Cf. Sirius*, 2014 WL 4725382, at *5. Instead, it codifies the limited "exclusive ownership" interests that California law had established and recognized as of the 1982 statutory revision yielding the current version of section 980(a)(2). Those interests exclude the rights asserted by Plaintiffs here.

#### 1.   "Exclusive Ownership" Does Not Confer All Known IP Rights

In its prior rulings, the Court has not reconciled its sweeping interpretation of the statutory phrase "exclusive ownership" with the following three considerations.

**Fair Use**.  Fair use is an equitable doctrine that limits copyright protection, allowing people other than the rightsholder to copy, distribute and perform copyrighted works in a variety of ways. *Sony Corp. of Am. v. Universal City*

1  *Studios, Inc.*, 464 U.S. 417, 455 (1984).  The availability of fair use is

2  constitutionally required; without it, copyright laws violate the First Amendment.

3  *Golan v. Holder*, 132 S.Ct. 873, 890 (2012).  The federal Copyright Act codifies

4  the availability of fair use in 17 U.S.C. section 107 (and has done so since 1976).

5        California Civil Code section 980 has no comparable codification of fair use.

6  According to the Court's reasoning in *Sirius*, the California Legislature thus

7  presumptively intended *not* to make fair use available for sound recordings, since it

8  was "likely aware" of all the "limitations listed in the Federal Copyright Act, yet

9  chose to incorporate only one exception into its revised § 980(a)(2)."  *See Sirius*,

10  2014 WL 4725382, at *7.  This reading of section 980(a)(2)—in which the only

11  available limitation or exception to "all rights that can attach to intellectual

12  property" is the one enumerated in the statute, and all others are excluded—makes

13  the statute unconstitutional because it does not provide for, and thus excludes the

14  availability of, fair use for sound recordings made before 1972.  *See Golan*, 132

15  S.Ct. at 890.[15]

16        A different interpretation is warranted.

17  **First Sale**.  One of the rights a copyright owner enjoys under federal law is

18  the right "to distribute copies . . . of the copyrighted work to the public."  17

19  U.S.C. § 106(3).  The "first sale" doctrine is an important limitation on this right,

20  providing that the "distribution" right is exhausted after the first time a given copy

21  has been sold.  In practical terms, this is the legal mechanism by which used

22  bookstores and used record stores can operate; without it, every successive

23  distribution of a given copy of a book or CD would be an infringement, so every

24  seller of previously sold works would be a serial law-breaker.  Since 1976, the

25  federal Copyright Act has codified the first sale limitation in 17 U.S.C. § 109.

---

26  [15] Lest iHeartMedia be accused of arguing against a straw man here, we note that

27  in the Pandora case, the plaintiff expressly contended that the omission of fair use
from section 980(a)(2) meant that fair use was unavailable for sound recordings.
Pl's Opp. to Mot. to Strike at 25 n. 8, *Flo & Eddie, Inc. v. Pandora Media, Inc.*,

28  14-7648 (C.D. Cal. Feb. 23, 2015) (Dkt. No. 23) ("*Pandora* Anti-SLAPP Opp.").

1    California Civil Code section 980 has no comparable codification of the first

2    sale doctrine.  According to the Court's reasoning in *Sirius*, the California

3    Legislature thus presumptively intended *not* to limit the exclusive right to

4    distribute a copy of sound recording to the public to just one initial sale, as

5    Congress did.  *See Sirius*, 2014 WL 4725382, at *7.[16]  Yet if there is no first sale

6    limitation applicable to section 980(a)(2), then every used record store in the state

7    of California would effectively be cast as a criminal enterprise—since the

8    exclusive right to distribute copies of a work to the public is clearly "one of the

9    rights that can attach to intellectual property."  *Cf. People v. Sisuphan*, 181 Cal.

10   App. 4th 800, 813 n.12 (2010) ("[C]riminal conversion occurs when [the]

11   defendant exercises dominion over property inconsistent with the owner's

12   rights[.]"); Cal. Civ. Code § 986 (granting artists five percent of all revenue from

13   the sale of their paintings in perpetuity).

14        The Legislature cannot have intended, and did not intend, any such result.  A

15   different interpretation is warranted.

16   **Rescission From The Public Domain**.  In the era before the 1982 revision

17   of section 980(a)(2), the distribution of a sound recording in commerce terminated

18   its California state law copyright protection (*i.e.*, its protection under then-

19   operative Civil Code section 980).  This is not open for debate; it is binding

20   precedent, under the Ninth Circuit's holding in *Lone Ranger*.  740 F.2d at 726.

21   Decades worth of popular sound recordings were thus, as of 1981, in California's

22   public domain.[17]

23

24   [16] Again, in the Pandora case, the plaintiff expressly endorsed this interpretation.
     *See Pandora* Anti-SLAPP Opp. at 23.

25
     [17] To be sure, certain uses of "published" sound recordings nevertheless remained
26   restricted under misappropriation, conversion, and unfair competition doctrines—
     but no California case has ever suggested, let alone held, that those restrictions
27   were entirely co-extensive with the rights under copyright law.  To the contrary, as
     discussed further, *infra* at 23-24, courts have applied these ancillary doctrines to
28   restrain only a limited set of uses of sound recordings, which neither resemble nor
     approach the full suite of rights afforded under copyright law.  *Cf. Pandora* at 13.

1    If the 1982 revision of section 980(a)(2) afforded all of those previously

2    "published" sound recordings "all rights that can attach to intellectual property"

3    (save the single one enumerated in the statute), then that legislative action amounts

4    to the single largest rescission of works from the public domain in U.S. history.

5    Yet it occurred at a time when even *copyright holders* assumed that removing

6    works from the public domain was unconstitutional.[18]  *See* Br. for Plaintiff-

7    Appellee at 15, *Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F.2d

8    718 (9th Cir. 1984).  And it triggered not even a whimper of objection from anyone

9    in the broadcasting industry, 1982 Leg. Hist. at 50—even though, under the

10   plaintiffs' theory, a resurrection of copyright protection (including "all rights that

11   can attach to intellectual property") would have imposed a *new* obligation to pay

12   royalties on public performances of sound recordings whose copyright protection

13   had previously been terminated.  Moreover, far from expressing an intention to

14   alter the *status quo ante* in the 1982 statutory revision, the Legislature expressed

15   the contrary intention, to *maintain* rights and remedies where they stood at the

16   time.  *Id.* at 14.  That meant *no* California copyright protection for previously

17   published sound recordings.

18      The Court's prior approach to interpreting section 980(a)(2) cannot be

19   reconciled with this legislative intent.  A different approach is warranted.

20       **2.    "Exclusive Ownership" Codifies Rights In Sound
21             Recordings Existing As Of 1982**

22      Section 980(a)(2) maintains the *status quo ante* from the time it was enacted.

23   *See id.* at 14.  At that time, authors of "compositions in letters or art" (including

24   sound recordings) were granted "an exclusive ownership" in those works until they

25   ────────────────────

26   [18] Even under today's prevailing standard for assessing the lawfulness of public
     domain rescissions, established in *Golan v. Holder*, this (putative) 1982 public
     domain rescission would likely be unconstitutional—because it contained none of

27   the protections or exceptions for reliance interests deemed essential in later cases.
     *See Golan*, 132 S.Ct. at 892, n. 33 (noting the care Congress exercised to avoid

28   Takings Clause problems by including a range of exemptions in a 1994 statutory
     rescission of works from the public domain).

1    were published, at which point all legal protection afforded by section 980

2    terminated.  *See id.* at 33-34; *Lone Ranger*, 740 F.2d at 726.  The identical phrase

3    was carried over into the new law.  The 1982 revision of section 980 did not have

4    the effect of resurrecting the copyright protection that California law had

5    previously extinguished.

6         In *Pandora*, the Court agreed that in the pre-1982 era, publication divested

7    sound recordings' section 980 rights.  *Pandora* at 10.  But the Court nevertheless

8    suggested that bringing published sound recordings back under copyright

9    protection in 1982 would not have been a material change because even published

10   sound recordings enjoyed protection under *non-copyright* common law doctrines

11   such as misappropriation, unfair competition, and conversion.  Specifically, the

12   Court ruled that these non-copyright doctrines—which it called "common law

13   property concepts"—effectively provided the exact same set of rights as the

14   copyright that was divested by publication; for this reason, as the Court put it,

15   "[t]he 'publication' repeal was a non-event, because sound recording owners

16   already enjoyed post-publication protection in California."  *Id*. at 13.  Thus, the

17   idea goes, deeming the current section 980(a)(2) applicable to previously published

18   sound recordings creates no significant departure from the *status quo ante*.

19        That is simply wrong.  iHeartMedia has no quarrel with the suggestion that

20   these non-copyright common law doctrines afforded *some* legal limits on the use of

21   published sound recordings (just as they afforded limits on the use of all manner of

22   property by third parties).  But there is no basis for the suggestion that those "post-

23   publication protection[s]" under misappropriation, unfair competition, and

24   conversion doctrine entirely replicated, or even approached, the full suite of

25   *copyright* rights available to a work before its publication.

26        To the contrary, precedent contradicts that conclusion.  Historically, the

27   California Court of Appeal understood that federal copyright law *preempted* state

28   law theories of protection that essentially mimicked copyright (in published

works).  So in common law cases involving sound recordings, courts went out of their way to make clear that conduct amounting to "misappropriation" or "unfair competition" was *different* from conduct amounting to copyright infringement.  As *Erickson* explained, U.S. Supreme Court precedent "prohibit[ed] state injunctions against copying but not against appropriations—the difference being between the duplication of one's work by another—copying—and the use of the identical product for the profits of another—misappropriation."  2 Cal. App. 3d at 534 (quoting Paul Goldstein, *Federal System Ordering of the Copyright Interest*, 69 Colum. L. Rev. 49 (1969)) (quotation marks omitted).  Courts thus specifically defined misappropriation doctrine *not* to replicate copyright doctrine.  This is why in one leading misappropriation case, "where the defendant, without authority, dubbed plaintiff's recorded performance, *the fact that the copying of a phonograph record was involved was deemed immaterial*."  *Id.* (emphasis added).

The "post-publication protections" available under *non-copyright* common law doctrines did not create the same exact set of rights as *copyright* law.  In fact, courts bent over backwards to ensure the opposite—that these two bodies of law were *not* co-extensive.  Misappropriation, conversion, and unfair competition doctrine restricted the particular forms of conduct California courts had applied those bodies of law to condemn: openly piratic, mass duplication of sound recordings in competition with a *bona fide* distributor.  Nothing more, nothing less.  So extending *copyright* protection to published sound recordings—previously subject only to misappropriation, conversion, and unfair competition rights— would indeed be a radical departure from the *status quo ante* in which copyright protection was extinguished.

The Legislature did not intend the 1982 revision of section 980 to have any such effect.  State law copyright protection did not apply to previously published sound recordings before the 1982 revision, and it does not apply to previously published sound recordings after the 1982 revision.  Plaintiffs' section 980(a)(2)

1   claim thus fails as a matter of law, because all of their sound recordings were

2   "published" as of 1982.[19]

3         **B.**    **Plaintiffs' Ancillary Claims Fail As A Matter of Law**

4         If Plaintiffs' ancillary claims under conversion, misappropriation, and unfair

5   competition law depend on their section 980(a)(2) claim, then the ancillary claims

6   fail because the section 980(a)(2) claim fails.  If Plaintiffs intend to assert these

7   ancillary claims independent of their section 980(a)(2) claim, then the ancillary

8   claims fail independently as well.  Though courts have allowed parties in limited

9   circumstances to invoke these doctrines to restrain mass duplication and resale of

10   previously published sound recordings, the "rights" under misappropriation,

11   conversion and unfair competition law have never been held to mirror, or even

12   approach, the full bundle of rights afforded under copyright law.  *Cf. Erickson*, 2

13   Cal. App. 3d  at 528; *Heilman*, 75 Cal. App. 3d at 560; *Lone Ranger*, 740 F.2d at

14   726.  No California case has ever proscribed radio play of sound recordings as a

15   freestanding misappropriation, conversion, or form of unfair competition.  This

16   Court should not extend those doctrines to cover activity that has been ubiquitous

17   and lawful for nearly 100 years.

18                  *            *            *

19         Plaintiffs cannot carry their burden under the anti-SLAPP law to show a

20   "probability of prevailing," because all of their claims fail as a matter of law; and

21   for the same reasons, the Court should grant iHeartMedia's motion to dismiss.

22                         **CONCLUSION**

23         iHeartMedia respectfully asks the Court to grant this motion to dismiss or, in

24   the alternative, anti-SLAPP motion.

25

26   [19] In the alternative, Plaintiffs' section 980 claim fails because there is no exclusive right of public performance for sound recordings under California law.  To the

27   extent that section 980(a)(2) does currently protect Plaintiffs' sound recordings, the rights it affords simply do not include the rights asserted in this case.  The Court is

28   familiar with this argument, having rejected it in the *Sirius* case—so iHeartMedia will not reprise it here in full, but hereby preserves the point for appeal.

1    Dated:  July 24, 2015

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

LATHAM & WATKINS LLP


By:  */s/ Andrew M. Gass*
     Andrew M. Gass
     James K. Lynch
     Brittany N. Lovejoy

Attorneys for Defendant
iHEARTMEDIA, INC.

SF\6020333